The **SPEE–FLO MANUFACTURING CORPORATION**, Plaintiff,

v.

**GRAY COMPANY, Inc., Defendant.**

Civ. A. No. 14247.

United States District Court
S. D. Texas,
Houston Division.

Oct. 14, 1964.

McNenny, Farrington, Pearne & Gordon, H. F. McNenny, Cleveland, Ohio, Hutcheson, Taliaferro & Hutcheson, Edward Hutcheson, Houston, Tex., for plaintiff.

Vinson, Elkins, Weems & Searls, J. V. Martin, Houston, Tex., and Leonard L. Kalish, Philadelphia, Pa., for defendant.

CONNALLY, Chief Judge.

## STATEMENT OF THE CASE

The plaintiff, a Texas corporation, seeks to recover for the alleged infringement of U. S. Letter Patent No. 3,000,576 for a "spray gun" for the airless spraying of paints and other liquid finishing materials, granted September 19, 1961, to Gustave S. Levey and Stanton F. Harvey, of which plaintiff is now the owner. The defendant is a Minnesota corporation with an established place of business within this District and Division. It has sold a number of its so-called "FF" (meaning fine finish) tips for use in its own spray guns and with guns of other manufacture. This is alleged to constitute the infringement.

To understand the contribution to the art which the plaintiff contends has been made by the patent in suit, some explanation and history of the use of spray painting is necessary. Spray painting has long been known and used in the application of paints, varnishes, lacquer and other finishing materials. Spray painting has been and is now done either with or without the use of compressed air. Where compressed air is used (referred to during the trial, and hereafter, as "air-spray painting" or with the "air-guns"), paint is delivered to the gun at a relatively low pressure, from a "pressure pot", and a jet of compressed air is impinged against the stream of paint to atomize it, or break it up into a mist, and to propel it toward the surface to be painted. It is desirable in all such cases to apply the paint in a strip or

swath of uniform texture, except at the edges. A "feathered" edge is desired, so that on succeeding passes an overlap may be made, and a complete covering of uniform thickness produced. A number of factors may affect the end result, such as the pressure at which the paint is supplied, its viscosity, flow rate, temperature, etc. It is without dispute in the evidence, however, that a skillful operator could produce a highly satisfactory result with the air spray gun; and until recently, practically all fine finishing (furniture, radio and television cabinets, pianos, appliances, etc.) was done by this means.

This air spray application, however, was attendant with certain highly unsatisfactory side results. When the paint, propelled by the stream of compressed air, struck the surface to which the finish was being applied, the paint-saturated air stream was deflected. This "over-spray" caused a waste of a substantial part of the finishing material being used, and additionally created a cloud of air, saturated with particles of paint, lacquer, solvents or other such materials. To protect the operator from breathing such air, it was necessary that the air in the work area be circulated constantly. Thus blowers, exhaust fans, filters and other such means were necessary.

By reason of these disadvantages of the air spraying, for a number of years airless spraying has received increasing favor in the industry. Airless paint spraying systems were offered for sale by the plaintiff, the defendant and a number of other companies in the field. In the airless spraying, an attempt was made to atomize and distribute the paint evenly by forcing it under high pressure through a small oval-shaped, sharp-edged nozzle opening. Much higher pump pressures were required. This airless method eliminated the disadvantages mentioned above which were attendant upon the air spray system, but the quality of the work was not as good. It appeared to be difficult, if not impossible, consistently to achieve a proper pattern or spray fan with the airless method, and the results in general were not satisfactory for fine finishing. The airless method was used extensively where fine finishing was not essential. Air spray was used almost exclusively where fine finishing was essential.

The invention in suit made it possible to eliminate the irregularities in the application of paint and other finishing material by an airless gun, whereby a result equally as desirable as that achieved with the air spray equipment might be attained. The disadvantages of the air spray system were eliminated. Witnesses in charge of finishing for Storkline (furniture), Eisen Bros. (furniture), Admiral (television and radio cabinets), Wurlitzer (organs), and Chris Craft (boats), in testifying on plaintiff's behalf, have expressed great satisfaction with plaintiff's new airless gun, and have stated that with the use thereof, a saving of approximately 20% in the materials to be applied has been accomplished, and that the same fine finish has been achieved as previously was available only with air spray.

## THE INVENTION AND THE PATENT

In all airless spray painting with guns of the general type here involved, the paint is pumped at high pressure (in the range of perhaps 500 to 1500 pounds per square inch) through a hose, and is introduced into the gun through a valve, which may be opened and closed by the operator with a trigger-like device. The paint passes through the valve orifice, through a passage in the gun, and thence to the nozzle or spray tip. The nozzle orifice or spray orifice is a small elliptical shaped hole through which the paint passes, where it is hydraulically atomized by reason of the reduction to atmospheric pressure.

Through an accidental discovery in late 1959 by Levey and Harvey, who were working with plaintiff's engineer Murdoch in attempting to improve the spray pattern, it was learned that a decrease in the pressure in the chamber between

the valve and the spray nozzle resulted in a much-improved pattern. After further experimentation, two methods of accomplishing this result were perceived, one form of which was commercialized by plaintiff in offering on the market its airless "H-gun" (for Harvey, one of the inventors) in December 1959.

The contribution of the patent in suit is the placing of a disc, with a center hole of a particular size (or, more accurately, in a particular ratio to the cross-sectional area of the spray orifice) between the valve and the spray orifice. This disc, with center hole, was referred to throughout the trial, and here, as the "pre-orifice". It should be emphasized at this point that the use of a pre-orifice in approximately the same position as shown by the patent in suit, in itself, is not new. But in general, such earlier pre-orifice devices were much larger in cross-sectional area than the spray orifice. The real contribution of the invention was ascertainment and recognition of the fact that if the pre-orifice is reduced in size to approximately the same as the spray orifice, that the improvement in the spray pattern is accomplished. In brief, this is explained by the patent and by the plaintiff's expert testimony at the trial, as follows. With the pre-orifice much larger than the spray orifice (as in pre-patent guns), the paint reached the nozzle or spray orifice under high pressure and with low velocity. It was accelerated in the nozzle opening to the high velocity and low pressure of the spray fan. This resulted in the formation of a vena contracta which was in large part responsible for the imperfect spray patterns resulting. When the pre-orifice was reduced to the same size as the nozzle orifice (as in one of the two preferred embodiments of the patent in suit), the paint moved through the pre-orifice, and into the small chamber anterior to the spray orifice, under a reduced pressure, but with increased velocity, and in the form of a submerged jet; and traveled through said chamber as a submerged jet until reaching the spray orifice. By reason of the fact that the reduction of pressure

was accomplished at the site of the pre-orifice, and of the fact that the paint moved as the submerged jet into the spray orifice, the vena contracta was eliminated; uniform and complete atomization was effected, and the desired spray pattern achieved.

The plaintiff's new H-gun embodying the pre-orifice met with immediate commercial success. The testimony from a number of plaintiff's satisfied customers mentioned above was most convincing. Plaintiff's sales increased several-fold.

Claims 1 to 6 inclusive, and 8 of the patent are in issue. Claims 1, 2 and 8 include the pre-orifice, the elongated sharp-edged spray nozzle, and the intervening chamber as portions of a passageway housed in a body, and adapted to be completely filled with liquid, without limitation to the construction of the body. These claims define the pre-orifice as having an area not exceeding twice the area of the nozzle opening, and as having a uniform diameter through an axial length about twice its diameter. Claim 3 defines a disc to be mounted in a spray gun having a spray nozzle, the disc having a cylindrical projection fitting into a recess in the tip, the projection having a central pre-orifice and being spaced from the spray opening to form the chamber. Claims 4, 5 and 6 define the pre-orifice, chamber and spray opening as being downstream from the valve and valve port in the complete gun, and define the pre-orifice as discharging a submerged jet into the chamber with a velocity and pressure substantially equal to the velocity and pressure of the paint passing through the spray opening. These claims are not limited to the pre-orifice being of uniform diameter throughout its axial length.

## THE DEFENSES

The defendant contends that the patent in suit is invalid, because anticipated by, and not inventive, over the prior art, alleging additionally the plaintiff's own prior public use of a pre-orifice of substantially the same dimensions; and that the patent is invalid for indefiniteness

within the purview of Title 35 U.S.C.A. § 112.

It is further contended that Claims 1 through 6 and 8 (all of those here in controversy) are not infringed by the defendant's Golden Gun and its FF tip. If infringed at all, it is contended that no infringement has been shown in this District and Division, and that venue does not lie.

It is further contended that the invention, if valid, was not made by Levey and Harvey, but by one Murdoch, an engineer then in plaintiff's employ and who was assigned to work and experiment to improve the spray pattern in airless painting.

Defendant further contends that the plaintiff made certain misrepresentations to the Patent Office as to the state of the prior art, with particular regard to the dimensions of a prior art Binks' pre-orifice device; and that plaintiff has misused its patent by tie-in sales requiring the purchase of certain unpatented pumps and related equipment with the purchase of the patented device by reason of which it is contended the plaintiff may not recover.

## OPINION

The action has been well prepared, thoroughly tried, briefed and submitted by able counsel for both parties. Their efforts have reduced the complexities of the case to as great a degree as circumstances permit.

*The Prior Art*

Fifteen of the prior art patents and publications relied on by defendant are aerosol type spraying devices, in which a volatile liquid under pressure is admitted into an expansion chamber where it at least partially bursts into a gas under pressure, which is delivered and guided through a round outlet hole. None of these devices has the liquid filled chamber and submerged jet of the patent in suit, none has the elongated sharp-edged spray nozzle opening, none operates like or gets the results of the patent in suit, and none anticipates or invalidates any of the claims in suit.

The U. S. patents to Bede, No. 2,-727,786, and Nord, No. 2,936,959, show airless spray guns and are relied on to show valve ports opening into chambers leading to spray nozzles, the valve ports being conical and containing needle valves with adjustable stops to limit their retraction. Maintaining the needle valve partially closed throttles the flow of paint, but does not create the compact submerged jet and does not obtain the results of the patent in suit. Mr. Nord, patentee of patent 2,936,959, and president of the Nordson Company, admitted that the guns of this patent, despite the adjustment of the needle valve, had a tendency to produce a less satisfactory feathered edge than the "Versa-gun" with a pre-orifice which replaced them after the plaintiff's patented guns appeared on the market.

The U. S. patent to Funke No. 2,601,-893 relied on by defendant was cited by the Patent Office. It shows a flame thrower designed to shoot out a solid round stream of fuel, with only sufficient aeration to maintain ignition. It does not disclose the elongated sharp-edged nozzle opening, does not disclose orifices within the range of sizes and ratios of sizes of the patent in suit, and does not teach the plaintiff's solution to the problem of airless paint spraying.

The U. S. patent to Wahlin, No. 2,-745,701, shows a sharp-edged restriction formed at the entrance to an approach passageway anterior to the nozzle. The patent does not disclose any sizes or ratios of areas of the nozzle opening and the restriction, but as shown in the drawing the restriction is many times larger than the critical limit of the patent in suit.

The Munson U. S. patent No. 2,629,-632, is a low pressure agricultural spray nozzle for spraying growing crops with insecticides, etc., having a pre-orifice disc for the purpose of purging the chamber between the disc and the nozzle to keep solid materials from clogging. The patent does not disclose any sizes or ratios of areas, and the drawings do not disclose relative areas within the critical limits

of the patent in suit. The nozzles and parts claimed to have been made by Munson during his unsuccessful effort to commercialize the device of his patent have not been proved to have been in the prior art. The only witness, Munson, testified he did not remember the sizes or relative areas of the pre-orifice and nozzle and the defendant produced no drawings or records giving any dimensions. These assemblies of Munson's work have not been proven to have been in the prior art, or to have been anything other than abandoned experiments.

The restrictors with which Mr. Bede is alleged to have experimented before his company was sold to the Nordson Company have not been proved. There is no evidence as to any ratio between the size of any alleged restrictor and any nozzle opening used with that restrictor. Mr. Bede was a pioneer in the field of spray painting, obtained many patents relating to spray painting, and wrote many articles and brochures praising his own paint spraying equipment, but the alleged restrictors were never mentioned in any of his patents or writing. The evidence shows that while one or more of Bede's employees were given a few samples with which to experiment, they were not satisfactory.

The restrictors with holes of .031 of an inch, claimed to have been sold by the Nordson Company for use on the ends of gun extensions to minimize dripping, have not been shown by defendant to be relevant, since there is no evidence that these were ever matched in area, within the critical limits of the patent in suit, with any spray nozzle.

Defendant has likewise failed to prove use or sale by Spray Engineering Company of any device anticipating the patent in suit. The sprinkler nozzles catalogued and sold by this company for low pressures include nozzles with pre-orifices and spray discs with round holes opening into slots, but there is no evidence of the relative areas of any pre-orifices and nozzle openings made prior to the patent in suit. The company has detail drawings showing the sizes of all parts of the nozzles, but none was produced, nor was there oral testimony of any such sizes. An airless spray gun sold by this company for low pressure spraying did not embody the same nozzle but had only a conventional valve orifice upstream from the spray opening.

Nothing in the prior art discloses the structure claimed in the patent in suit operating in the same way to get the same results, and there is no anticipation of any of the claims in suit.

The invention of the patent in suit, as a whole, would not have been obvious to one having ordinary skill in the art at the time the invention was made.

*Validity*

The basic question, in my judgment, is that of the validity of the patent for an inventive contribution over the prior art. Despite the assistance of counsel, the question is not free of doubt.

It is true, as defendant argues, that in the final analysis the question is one of degree. The plaintiff and others had used pre-orifices before; and, reduced to its simplest terms, the patent does little more than reduce the size of the earlier pre-orifices by several one-thousandths of an inch, to bring it in close relation to the size of the nozzle orifice. The defendant, in derogatory fashion, refers to the patent as no more than "hole shrinking". I am convinced, however, that the use of the earlier pre-orifice devices did not accomplish the improved results now available; and that such use was made apparently without recognition of the fact that the relation of the size of the pre-orifice to the spray orifice was the key to the problem.

On mature consideration, I am of the view that the patent is valid, falling within that class of cases wherein the invention, after disclosure, appears so simple as to lead inevitably to the contention by the defendant that any one skilled in the art should have seen and recognized the principle involved from the outset. Yet, despite the fact that the contribution may have been slight, nevertheless it was the difference between suc-

cess and failure in the field. Where the invention has met with immediate commercial success and imitation by others, these circumstances are entitled to considerable weight where the issue of inventiveness otherwise is in doubt. The Barbed Wire Patent Washburn & Moen Manuf'g Co. v. Beat 'Em All Barbed Wire Co.], 143 U.S. 275, 12 S.Ct. 443, 36 L. Ed. 154 (1892); Edison Electric Light Co. v. United States Electric Lighting Co., 52 F. 300 (2nd Cir., 1892); Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523 (1922); National Latex Products Co. v. Sun Rubber Co., 274 F.2d 224 (6th Cir., 1959); Jeoffroy Mfg. Inc. v. Graham, 219 F.2d 511 (5th Cir., 1955); and Wahl Clipper Corp. v. Andis Clipper Co., 66 F.2d 162 (7th Cir., 1933). The following language from National Latex Products Co. v. Sun Rubber Co., supra, is illustrative of these established principles of patent validity:

"The long-established tests of invention exists here in a high degree. Competitors were working to solve the problem achieved by Molitor. Prior invention had failed to accomplish the result of Molitor and within a few years the process has to a great extent replaced the prior practice of the art. * * * "

"This is one of the strongest indicia of invention. Plainly, when manufacturing concerns, practicing the art and competing with each other in the market, extensively replace one method for another, it is evidence of invention. (Many cases cited) * * * When the prolonged efforts of experts fail to produce the remedy desired, the discovery of the needed improvement and commercial success justify the conclusion that there is invention although the device is simple. Here there was a technological block and the fact that those skilled in the art had failed to eliminate it is cogent evidence of invention." .

It follows from the foregoing that I am unable to credit defendant's contention that the advancement in the art resulted not from the patent in suit but from general improvement in equipment and know-how. Several years prior to the patent, the defendant had produced high pressure pumps which advanced the use of airless spray painting in general. Mr. Bede had offered paint heaters, whereby the temperature of the liquid to be applied might be controlled. While these and other efforts in the industry no doubt had their effect, they did not permit the use of airless equipment for fine finishing work. Additionally, this argument of the defendant would have more force had the defendant not been among the first to imitate the plaintiff's contribution.

■ Nor is the patent invalid for vagueness. It is true that it allows for a considerable range in the ratios permitted between the pre-orifice and nozzle orifice. It follows that some trial-and-error type of experimentation may be required by an operator before he may achieve the desired spray pattern. But there are many variables in the qualities and characteristics of the liquids to be applied. No single ratio would give the desired result from all materials. The fact that some such experimentation may be required by the operator—or that an unskilled operator may continue to get unsatisfactory results because of the variables involved—does not render the patent invalid for uncertainty. The skilled operator can do a better job with it than he could before. Locklin v. Switzer Bros., Inc., 299 F.2d 160 (9th Cir., 1961); Binks Mfg. Co. v. Ransburg Electrocoating Corp., 281 F.2d 252 (7th Cir., 1960); Schick Dry Shaver v. R. H. Macy & Co., 28 F.Supp. 1013 (D.C.N.Y., 1939).

*Infringement*

Shortly after plaintiff's patented gun was marketed, the defendant offered its "Golden Gun" and its "FF tips". Theretofore in the industry, in general, the nozzles offered by the several manufacturers were interchangeable, and might be used on guns of other manufacture. Defendant's FF tips similarly were made

primarily for use with defendant's new Golden Gun, but likewise might be used on guns of other manufacture. The FF tip embodied the principle of the pre-orifice with a chamber between the pre-orifice and the nozzle orifice through which the paint passed, constituting a small assembly which might be readily removed from one gun and inserted in another. The defendant made extravagant claims as to the fine finishing which might be accomplished with its new FF tips, and its advertising brochures and instructions to its salesmen contended that finer results might be achieved than had been possible theretofore with defendant's regular guns and equipment. The FF tips which were packaged and sold separately from the defendant's gun, bore the inscription "Pat. Pending", though this was patently false. No application was on file then or thereafter.

Shortly thereafter the Nordson Company offered its "Versa-gun" on the market containing a pre-orifice device bearing much similarity to plaintiff's H-gun. This company made common cause with the defendant in the defense of the present action.

Binks Manufacturing Company and Spraying Systems Company each offered pre-orifice discs for insertion in their regular guns, with instructions for matching such pre-orifice discs with varying nozzle sizes.

The Delavan Company also offered a pre-orifice insert in many respects similar to those mentioned above, and after notice of infringment of the patent in suit took a license from plaintiff.

The defendant makes special denial of infringement as to Claims 1, 2 and 8 by reason of the fact that each calls for a "body formed with a passageway adopted to be connected to a source of liquid under pressure" and to which a spray tip is secured, and providing further for a "passageway" in the body with "means in said passageway forming a restricted orifice." It is argued—and I think correctly—that the term "body" as used therein refers to the gun itself with the passageway being that portion normally considered as the barrel of the gun. The defendant makes the point that in the accused FF tip the pre-orifice is in the shell of the nozzle or in the tip holder, and not in the "passageway" of the gun as required by these claims. Thus the defendant has moved the pre-orifice and the "passageway" forward in its gun, and housed the same in a removable casing. The defendant's tip, of course, is completely useless except when affixed to and made an integral part of a separate gun. When this is done, it does the same work in substantially the same way and accomplishes the same result as does the patented device. The defendant may not avoid infringement by the simple expedient of moving the pre-orifice slightly forward and housing it in the removable section.

The other differences and distinctions which defendant undertakes to make, in my judgment, are minor and inconsequential; and the accused FF tip mounted in the intended manner on a spray gun embodies all of the elements of the patent in suit, operating in the same way to obtain the same results. The manufacture, use, and sale of defendant's FF tips constitute direct infringement of each of Claims 1, 2, 3 and 8, and inducement to infringe, and contributory infringement of each of Claims 4, 5 and 6. The infringement was conscious and deliberate.

The other defenses advanced by defendant are not substantial and not supported by the evidence.

From the foregoing, it follows that the Court has jurisdiction of the subject matter and of the parties; that the plaintiff is the owner of the patent in question; that the claims in controversy (Nos. 1–6 inclusive, and 8) of patent No. 3,000,576 are valid. The defendant in the sale of its FF tips for airless spray guns in this District and Division has directly infringed each of Claims 1, 2, 3 and 8, and has induced infringement of each of Claims 4, 5 and 6.

Plaintiff is entitled to appropriate relief.

The foregoing is adopted as Findings of Fact and Conclusions of Law.