**GRAY COMPANY, Inc., Appellant,**

v.

**The SPEE–FLO MANUFACTURING CORPORATION, Appellee.**

**No. 22354.**

United States Court of Appeals
Fifth Circuit.

May 27, 1966.

Rehearing Denied July 19, 1966.

J. V. Martin, A. H. Evans, Houston, Tex., Leonard L. Kalish, Philadelphia, Pa., for appellant, Vinson, Elkins, Weems & Searls, Houston, Tex., of counsel.

Harold F. McNenny, Cleveland, Ohio, Edward C. Hutcheson, Houston, Tex., for appellee, McNenny, Farrington, Pearne & Gordon, Cleveland, Ohio, Hutcheson, Taliaferro & Hutcheson, Houston, Tex., of counsel.

Before TUTTLE, Chief Judge, and JONES and WATERMAN,* Circuit Judges.

TUTTLE, Chief Judge:

This is the third patent case to be decided by our Court since the recent important decision by the United States Supreme Court in the four patent cases: Graham v. John Deer Company, 1965, (Calmar v. Cook, Colgate Chemical Co. v. Cook) 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed. 2d 545 and United States v. Adams, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572, 1965. This case, as did the earlier of the two others decided by our Court, Zero Manufacturing Company, Inc. v. Mississippi Milk Producers Asso., (5 Cir.) 358 F.2d 853, Mar. 22, 1966, presents for our consideration, in addition to the standard defenses, the question of the "obviousness" of the difference between the subject matter sought to be patented and the prior art.[1]

The patent in suit, U. S. Letter of Patent No. 3,000,576 was for a "spray gun" for the airless spraying of paints and other liquid finishing materials. It was granted September 19, 1961 to Gustave S. Levey and Stanton F. Harvey, and has been assigned to the Plaintiff in the trial court, the Spee-Flo Manufacturing Corporation. The Defendant, Gray Company, Inc., is a Minnesota corporation with an established place of business within the Southern District of Texas,

---

* Of the Second Circuit, sitting by designation.

1. Title 35 U.S.C.A. § 103 provides:
   "A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

where it has sold a number of its so-called FF (meaning Fine Finish) Tips for use in its own spray guns, and with guns of other manufacturers. The sale of these FF Tips is alleged to constitute the infringement.

It is clear from the record that the following statement by way of explanation and history of the use of spray painting made by the trial court is fully warranted by the record:

Spray painting has long been known and used in the application of paints, varnishes, lacquer and other finishing materials. Spray painting has been and is now done either with or without the use of compressed air. Where compressed air is used (referred to during the trial, and hereafter, as "air-spray painting" or with the "air-guns"), paint is delivered to the gun at a relatively low pressure, from a "pressure pot", and a jet of compressed air is impinged against the stream of paint to atomize it, or break it up into a mist, and to propel it toward the surface to be painted. It is desirable in all such cases to apply the paint in a strip or swath of uniform texture, except at the edges. A "feathered" edge is desired, so that on succeeding passes an overlap may be made, and a complete covering of uniform thickness produced. A number of factors may affect the end result, such as the pressure at which the paint is supplied, its viscosity, flow rate, temperature, etc. It is without dispute in the evidence, however, that a skillful operator could produce a highly satisfactory result with the air spray gun; and until recently, practically all fine finishing (furniture, radio and television cabinets, pianos, appliances, etc.) was done by this means.

This air spray application, however, was attendant with certain highly unsatisfactory side results. When the paint, propelled by the stream of compressed air, struck the surface to which the finish was being applied, the paint-saturated air stream was deflected. This "over-spray" caused a waste of a substantial part of the finishing material being used, and additionally created a cloud of air, saturated with particles of paint, lacquer, solvents or other such materials. To protect the operator from breathing such air, it was necessary that the air in the work area be circulated constantly. Thus blowers, exhaust fans, filters and other such means were necessary.

By reason of these disadvantages of the air spraying, for a number of years airless spraying has received increasing favor in the industry. Airless paint spraying systems were offered for sale by the plaintiff, the defendant and a number of other companies in the field. In the airless spraying, an attempt was made to atomize and distribute the paint evenly by forcing it under high pressure through a small oval-shaped, sharp-edged nozzle opening. Much higher pump pressures were required. This airless method eliminated the disadvantages mentioned above which were attendant upon the air spray system, but the quality of the work was not as good. It appeared to be difficult, if not impossible, consistently to achieve a proper pattern or spray fan with the airless method, and the results in general were not satisfactory for fine finishing. This airless method was used extensively where fine finishing was not essential. Air spray was used almost exclusively where fine finishing was essential.

The invention in suit made it possible to eliminate the irregularities in the application of paint and other finishing material by an airless gun, whereby a result equally as desirable as that achieved with the air spray equipment might be attained. The disadvantages of the air spray system were eliminated. Witnesses, in testifying on plaintiff's behalf, have expressed great satisfaction with plaintiff's new airless gun, and have stated that with the use thereof, a saving of approximately 20% in the materials to be applied has been accomplished, and that the same fine finish has been achieved as previously was available only with air spray.

We also conclude that the record fully warranted the following findings made by the trial court:

"In all airless spray painting with guns of the general type here involved, the paint is pumped at high pressure (in the range of perhaps 500 to 1500 pounds per square inch) through a hose, and is introduced into the gun through a valve, which may be opened and closed by the operator with a trigger-like device. The paint passes through the valve orifice, through a passage in the gun, and thence to the nozzle or spray tip. The nozzle orifice or spray orifice is a small elliptical shaped hole through which the paint passes, where it is hydraulically atomized by reason of the reduction to atmospheric pressure.

Through an accidental discovery in late 1959 by Levey and Harvey, who were working with plaintiff's engineer Murdoch in attempting to improve the spray pattern, it was learned that a decrease in the pressure in the chamber between the valve and the spray nozzle resulted in a much-improved pattern. After further experimentation, two methods of accomplishing this result were perceived, one form of which was commercialized by plaintiff in offering on the market its airless "H-gun" (for Harvey, one of the inventors) in December 1959.

The contribution of the patent in suit is the placing of a disc, with a center hole of a particular size (or, more accurately, in a particular ratio to the cross-sectional area of the spray orifice) between the valve and the spray orifice. This disc, with center hole, was referred to throughout the trial, and here, as the "pre-orifice." It should be emphasized at this point that the use of a pre-orifice in approximately the same position as shown by the patent in suit, in itself, is not new. But in general, such earlier pre-orifice devices were much larger in cross-sectional area than the spray orifice. The real contribution of the invention was ascertainment and recognition of the fact that if the pre-orifice is reduced in size to approximately the same as the spray orifice, the improvement in

the spray pattern is accomplished. In brief, this is explained by the patent and by the plaintiff's expert testimony at the trial, as follows. With the pre-orifice much larger than the spray orifice (as in pre-patent guns), the paint reached the nozzle or spray orifice under high pressure and with low velocity. It was accelerated in the nozzle opening to the high velocity and low pressure of the spray fan. This resulted in the formation of a vena contracta which was in large part responsible for the imperfect spray patterns resulting. When the pre-orifice was reduced to the same size as the nozzle orifice (as in one of the two preferred embodiments of the patent in suit), the paint moved through the pre-orifice, and into the small chamber anterior to the spray orifice, under a reduced pressure, but with increased velocity, and in the form of a submerged jet; and traveled through said chamber as a submerged jet until reaching the spray orifice. By reason of the fact that the reduction of pressure was accomplished at the site of the pre-orifice, and of the fact that the paint moved as the submerged jet into the spray orifice, the vena contracta was eliminated; uniform and complete atomization was effected, and the desired spray pattern achieved.

The plaintiff's new H-gun embodying the pre-orifice met with immediate commercial success. The testimony from a number of plaintiff's satisfied customers mentioned above was most convincing. Plaintiff's sales increased several-fold.

Claims 1 to 6 inclusive, and 8 of the patent are in issue. Claims 1, 2 and 8 include the pre-orifice, the elongated sharp-edge spray nozzle, and the intervening chamber as portions of a passageway housed in a body, and adapted to be completely filled with liquid, without limitation to the construction of the body. These claims define the pre-orifice as having an area not exceeding twice the area of the nozzle opening, and as having a uniform diameter through an axial length about twice its diameter. Claim 3 defines a disc to be mounted in a spray gun having a spray nozzle, the disc hav-

ing a cylindrical projection fitting into a recess in the tip, the projection having a central pre-orifice and being spaced from the spray opening to form the chamber. Claims 4, 5 and 6 define the pre-orifice, chamber and spray opening as being downstream from the valve and valve port in the complete gun, and define the pre-orifice as discharging a submerged jet into the chamber with a velocity and pressure substantially equal to the velocity and pressure of the paint passing through the spray opening. These claims are not limited to the pre-orifice being of uniform diameter throughout its axial length." 237 F. Supp. 616, 618–619 (S.D.Texas 1964).

The case was fully tried, both parties presenting extensive deposition and oral evidence, both by lay and expert witnesses. Much documentary and physical evidence was introduced. We have considered carefully such parts of the evidence and record as have been called to our attention by the six briefs filed by the parties. The trial court, in a full and able opinion, upheld the validity of Claims No. 1 through 6, inclusive, and 8 of the patent, and held that Appellant, in the sale of its FF Tips for airless tips for spray guns, has directly infringed each of Claims 1, 2, 3 and 8, and has induced infringement of each of Claims 4, 5 and 6.

With the exception of the paragraph of the trial court's opinion dealing with the "obviousness" challenge to the patent, we consider that the opinion of the trial court fully and adequately states the findings of fact and conclusions of law to be applied here. All that is there said is adopted by this Court as to all grounds of defense except as hereinafter discussed with respect to the issue of "obviousness." The opinion and decision of the district court are reported at 237 F.Supp. 616. The supplemental opinion, which we also adopt, is reported at, 255 F.Supp. 618.

Appellant here lays great stress on its argument that, to use the language of Section 103, any contribution made by the patentee in first appreciating the fact that the use of a pre-orifice having a relationship in dimension to the spray-orifice, would achieve substantial improvement in the art was "such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."

In its opinion in the cases of *Graham, Calmar, Colgate,* supra, the Supreme Court said, "Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or non-obviousness of the subject matter is determined."

We conclude that the trial court had ample basis upon the record as developed before it, upon application of the criteria stressed by the Supreme Court, to determine that "the invention of the patent in suit, as a whole, would not have been obvious to one having ordinary skill in the art at the time the invention was made."

Appellant in its brief stresses the fact repeatedly that, in the pre-patent art, many discs containing a small, centered hole were installed upstream from the nozzles marketed by others. Appellant takes great pains to show that the apertures of pre-orifices thus made ran the whole range of sizes that may properly be comprehended within Appellee's patent when taken in consideration with the size of the spray apertures specified by the Appellee. There are two complete answers to this. One of them is that many of the pre-orifice arrangements that were made were made with respect to spray guns which were not for the use of liquid paint, but were for use with atomized or gaseous materials (e. g., aerosol-type sprays).[2] The other answer

2. The significance of this difference is that the effect sought and achieved by the invention in suit is at least partially attributed to the creation of a "submerged

is that there is no proof that, in any instance, was there an appreciation or recognition of the fact that there was an optimum proportion to be sought between the size of the pre-orifice and the size of the nozzle opening, as is claimed in the patent in suit.

The closest Appellant came to demonstrating that before the patent in suit there was something of an appreciation of the desirability of reducing the pressure upstream from the nozzle, is the Bede patent, No. 2727786. This patent shows airless spray guns which contain valve ports opening into chambers leading to spray nozzles, wherein the valve ports, being conical, contain needle valves with adjustable stops to limit their retraction. It was demonstrated that Bede, the inventor, concluded that he could eliminate some of the difficulties of pre-patent air spray work by maintaining the needle valve partially closed, thus throttling the flow of paint. From this it is argued that it was a simple matter for a person knowledgeable in the art to conclude that the use of a pre-orifice in the form of a disc, as is claimed in the patent in suit, would be an obvious next step. The answer to this is that, whereas Bede testified he used discs having an orifice of substantially larger size than that of the nozzle and also tried discs having variable sizes, he was not able to correct the deficiencies that were the subject of his experiments. He did not correlate the size of the aperture in the disc and the aperture in the nozzle. As a result, it appears that he continued principally the sale of airless spray guns only for use with heated paint, and did not appreciate the importance of the pre-orifice having the rela-

tionship to the nozzle opening within the ranges claimed in the patent in suit.

We have carefully considered the facts in this case with those before this court in Zero Manufacturing Company, Inc. v. Mississippi Milk Producers Ass'n, supra, where we held that the patent was invalid because of not meeting the standards of Section 103. We conclude that what was there held is wholly consistent with our determination here that the trial court did not err in its finding that the patent in suit here was an improvement that would not be obvious to a person having ordinary skill in the art.

█ Finally, Appellant claims that, even in the patent in suit, the claims are worded as to claim the invention even though no precise proportions between the orifices are stated, and, even though some trial and error is required to ascertain precisely the optimum relation for a particular use. Nevertheless, the invention demonstrated that the defects of the pre-patent airless sprays were correctable by the use of a pre-orifice of equal size to the nozzle orifice, with tolerances up to not more than twice the size or down to not less than one-quarter the size of the nozzle. The fact that some trial and error adjustments must be made to adapt the patent to the particular materials used, the pressure available, and the particular desired result does not impair the validity of the patent for vagueness. See Lever Bros. Co. v. Proctor & Gamble Mfg. Co., (4 Cir.) 139 F.2d 633, 638, 639.

The Judgment of the trial court is

Affirmed.

jet" of the liquid paint which, obviously, could not exist unless the intervening

chamber was filled with a liquid as distinguished from a gas.